## MILLIE RATLIFF *v.* THE STATE.

Homicide — Verdict — When Set Aside.

> The verdict of a jury will be set aside, in a criminal case, if the evidence is insufficient to establish with certainty that the accused participated in the crime.[1]

1

Where the verdict of a jury is not supported by the evidence in the case it should be set aside by the court. Barnett *v.* Jayne, 1 Miss. Dec. 65, and cases cited in note 2.

The verdict of a jury will be set aside on consideration of the facts alone

Appellant, Millie Ratliff, was convicted of murder and sentenced to the penitentiary for life, and appeals. The opinion of the court contains a full statement of the facts.

APPEALED from Circuit Court, Lee county, JAMES A. GREEN, Judge.

Reversed and new trial awarded, May 16, 1881.

*Attorneys for appellant, W. L. Clayton and J. A. Brown.*

*Attorney for the State, T. C. Cathings, Attorney-General.*

Brief of W. L. Clayton:

I am clearly of the opinion that the verdict of the jury was not justified by the evidence. I know the rule of law on this subject, and speak advisedly when I assert that the evidence is not sufficient to sustain the verdict. I shall not argue this point at length, but I call the special attention of the court to it, and do specially insist and honestly .believe that the verdict should be set aside on this ground. The other defendant, Bill Hutchinson, has been executed for this same murder, and no one can for one moment contend, in the light of the evidence, that Millie Ratliff

---

if they fail to sustain it. Allen *v.* State, 1 Miss. Dec. 126, and cases cited in notes.

A decree of the lower court will not be reversed in the Supreme Court unless the record affirmatively shows that injustice has been done, the presumption being that the court had sufficient reasons for its action. Smith *v.* Harris, 1 Miss. Dec. 210, and cases cited in note 1; see cases cited in 1 Miss. Dec. 407, note 1.

A verdict will not be allowed to stand where there is palpable failure of the proof to sustain it. In such cases a new trial will be granted. Campbell *v.* State, 1 Miss. Dec. 413, and cases cited in note.

Manifest error in a verdict is sufficient ground for the reversal of the judgment thereon. Walker *v.* State, 1 Miss. Dec. 431, and cases cited in notes.

If the verdict of a jury is contrary to the evidence and the instructions of the court, it should be set aside and a new trial granted by the court. Turley *v.* Ingram, 1 Miss. Dec.· 542, and cases cited in notes.

The judgment of the Circuit Court will be reversed on the ground that the verdict is wrong, when no error of law is complained of, if the evidence is insufficient to support the ‚verdict of the jury. Porter *v.* State, 1 Miss. Dec. 555, and cases cited in notes.

was guilty of the killing. If she is to be found guilty at all it must be as aiding, counselling and assisting, or consenting to the murder. The killing evidently took place some seventy yards from the house, where the first puddle of blood was found, and where there were signs of the stick having been stuck in the soft ground. The killing was also evidently done with the big hickory stick found by the witnesses some twenty steps from the place. Emerilla Morgan, the step-daughter of deceased, says: "Bill cut that stick about a week before the killing." There is no evidence to show that Millie Ratliff knew that such a stick was in existence. There was the track of *only one person* from the first puddle of blood across the logs to the corner of the stable, where the girl says she found her mother, and that track was made by a shoe or boot of the size of Bill's, while the testimony clearly shows that Millie wore a number 5 shoe, much less than the size of the track. Again, Martha must have gone out there where she was killed, and been followed by the person who killed her, for the reason that there was no evidence of a scuffle about the house, or on the way to the place of the killing. Again the witness, Emerilla Morgan, says, in all her various statements of the testimony, first, last and all the while, that Bill Hutchinson, her papa, waked her up in the morning when he came in by slamming the door to, and then went to *where Millie was, in bed,* and asked her for another pair of pants, and that he changed his clothes and pulled off his shoes and put on his boots. These facts, taken in connection with his statement that Martha had fallen off the old stable and killed herself, leave no doubt in any reasonable mind that he did the killing. Was Millie present? I think I may safely say the proof fails to show it, but rebuts the presumption. But one track was ever seen and identified as the probable track of either Bill or Millie, in close proximity to the body or place of killing, and that was Bill's. But, it may be asked, how did Millie know where the deceased was, and how came she to say to Bedford, "Martha had fallen off the old stable and killed herself?" This is very readily accounted for as follows: Emerilla Morgan's testimony shows that when Bill came in and waked her up in the morning and asked Millie to get him another pair of pants, and she told him from the bed, where she was lying, where they were, he then told the witness to get up and go to Mr. Pratt's for a bucket of water; that she got up and then saw her mother

was not in bed with her, and that she asked her pa, Bill, where her ma was, and he said *she had gone out to the old stable to get boards to make her a chicken coop, and that Millie was present and heard the conversation.* This very readily and intelligently accounts for Millie's telling the girl to go out to the old stable to call her mother to breakfast. Then she was found by the side of the stable, and Bill said her feet were fast in the crack of the same, and that she had fallen off of it and killed herself. She at once ran out to Bedford's, and there was nothing more natural than that she should suppose that the deceased came to her death in that way; and especially, as anyone who was not guilty would, at the moment and before time for thought and investigation had been made and taken, be likely thus to be misled.

But you say, Bedford says Millie said, "You can't prove it on us." But he did not hear all the conversation and may have been mistaken about Millie's having made any such statement. Mr. Oswalt, witness for the State, says Bill said, "You can't prove anything," and Millie said nothing.

But the old woman, mother of Bill, Rachel Bowen, says that in the early cotton-picking time, after Bill had whipped Martha, Millie said, "If you don't do as you agreed you would, I'll do it," and from this, I am told, that Millie had agreed to aid and assist Bill in the murder of his wife. Well, there is just nothing in this. She did not know what it referred to, and then, again, the witness was the mother of Bill, who had been hung for the murder, and of course had no good or kind feeling toward Millie, and she was also a very ignorant witness, declaring that it was not any year at all, but just cotton-picking time. She also says. Mr. Roberts, on whose place in Monroe county Bill and Martha then resided, was present and heard the whole thing, and yet he was not called to substantiate her statement.

But again, I am told that Emerilla Morgan says she heard Millie come into the house some time in the night, or at least heard her near the door, and heard her go to the bucket and get a drink of water, and then went and got into bed. Now let us examine this statement as though it were admitted to be true. She says she then went to sleep, and after a long while, as it seemed to her, she was again waked up by her pa's coming in, slamming the door to and stamping his feet. Bear in mind that it was in March, and that Bedford says in his testimony that he

was up at 2 o'clock and it was then raining; and that the killing took place after the rain is evident from all the evidence. The witness does not undertake to even guess what time in the night it was when Millie was up, but, as she went to sleep after that and slept a long while, it is reasonable to conclude that the time Millie was up was as early as 2 o'clock at any rate.

Again, there is no evidence that Martha was not in the bed at this time. The witness had not missed her then, and did not afterward until the long nap was out and Bill told her to get up. So that there is no evidence that any crime had been committed when Millie was said to have come in, but a very·strong presumption that Martha was then in her bed. So we conclude from the evidence that Bill killed the deceased, and Millie did not, and was not present. * * * .

Brief of J. A. Brown:

Millie is manifestly innocent. The rain fell at 2 o'clock in the morning. The stick with which Martha was killed was *dry* and the single track, a number 7 shoe, was made after the rain. Bill, who wore that shoe, awoke Emerilla by his stamping as he came in, after killing his wife, and called Millie, who was in bed, where she went "a long time before." Millie began getting breakfast soon after Bill came in, between 2 and 6 A. M., on March 1st, and told Emerilla to go and call her mother to breakfast. She laughed when arrested, and, some say, looked at Bill. Then she did not suspect that Bill had killed his wife, but thought from her feet sticking in the cracks of the old log stable that Bill's conjecture that she had gone there to get boards and fallen back (the wound was on the back of the head) and struck against the log, was correct.

When she laughed Millie did not know that the other pool of blood, the stick, the number 7 track, were there. She wore a number 5 shoe and never quarreled. Six months before (or perhaps six years—year not given), she had induced Bill to whip his wife, and when his mother stopped him she told Bill that "If he did not do what he agreed to do, she would do it." That remark was not in her mind when she laughed. She had forgotten it, as it had nothing to do with her arrest or Martha's murder.

If Emerilla's first statements are true, Millie is not only innocent of this crime, but is a very good woman; if, on the contrary,

her last statement is true, Millie is a termagant, but still she is in no way connected with the murder.

On such evidence as that against Millie it would be *wrong* to let the verdict stand. The least which can be said in her favor is that the strong probability is that she had nothing to do with it, and the most which can be said against her is that she may be suspected of having a hand in it.

The latter is however just as true of Emerilla. She was in the house as well as Millie, and does not seem to be troubled with conscience. If Millie was the witness, doubtless Emerilla's conduct would appear just as suspicious.

Emerilla plainly swore falsely at one time. Her statements are irreconcilable. On this trial, tutored by her uncle, "not to get caught in a lie," she was manifestly swearing to convict, stupidly it is true, but such was her evident design.  *  *  *

Brief of T. C. Catchings, Attorney-General:

I do not deem it necessary to reply to the argument of counsel as to the sufficiency of the testimony to support the verdict. It is not very voluminous, and being wholly circumstantial, the court will of course scrutinize it carefully, thus rendering unnecessary a discussion of it by me. I will, however, observe that the relations between plaintiff and the deceased are shown to have been of the most hostile character, and this hostility was fully justified as to the deceased. Many difficulties, some of them ending in personal violence, had occurred between them. The accused had greatly wronged the deceased by interfering with and practically breaking up the marital relation between her and her husband, and as usual in such cases, felt more bitterness and malice towards her than she would have done had she herself been the wronged party. A scoundrel, by some strange perversity of human nature, always cherishes the most intense hatred for those whom he has most wronged.

She had an interest in the death of the deceased, for then she would not only be rid of an object of hatred, but of the only obstruction in the way pursued by her, looking to her establishment as the chosen consort of the husband of deceased.

All the circumstances point to the conclusion that the deceased was murdered by her husband, and that he was aided, abetted and supported by the accused.

Her conduct when under arrest, as well as before, shows this.
Two juries have, under oath, so said, and it is not for this court to
say that they were wrong, unless it is perfectly manifest that they
were, and surely that cannot be affirmed.   *    *    *

OPINION.—COOPER, J.:

The appellant and one William Hutchinson were convicted
of murder on the indictment in this cause at the August term,
1880, of the Circuit Court of Lee county.   The verdict of the jury
at that time was, "guilty of murder, and we, the jury, affix the
punishment at imprisonment in the penitentiary for the period
of seven years."   On motion this verdict was set aside by the
circuit judge, and appellant was admitted to bail in the sum of
$500.   She was again tried at the February term, 1881, of the
said Circuit Court of Lee county, and again found guilty of
murder, and the punishment fixed by the jury to be imprisonment
for life.   Appellant again made a motion for a new trial, and
from a judgment overruling it she prosecuted this appeal.   The
evidence, in short, is to the effect: Appellant, for some months
preceding the murder with which she is charged (and for which
William Hutchinson has been convicted and executed), was a
member of Hutchinson's family, living in open and shameless
adultery with him.   There was, as would naturally be inferred,
enmity between appellant and the wife of Hutchinson, and there
were probably a number of difficulties between them, in which
Hutchinson took part against the wife.   On the night of, or preced-
ing the homicide, Hutchinson and appellant slept together, the
wife and her daughter, a girl of some fourteen years, occupying
another bed in the same room.   During the night there was a rain;
about daylight in the morning, Hutchinson's wife was discovered
at or near an old stable, dead; her skull was crushed and there was
blood where she was found and a larger quantity some yards
nearer the residence; between the points where the blood was
found there were some tracks, made since the rain, of a single
person, made by a shoe not less in size than a number 7; a
dry club was found near the stable, and on it there was blood;
there was also some blood on some logs which were near the
stable.   About daylight, or a little before, Hutchinson went to
the house of his employer and fed the stock; a few minutes after
he had left appellant also appeared there and stated to the em-

ployer (Mr. Pratt) that Martha (the deceased) was dead; that she had fallen out of the stable and killed herself. She also soon afterwards went to the house of another person living in the vicinity and made the same statement. These neighbors soon appeared at the scene of the homicide, when the *indicia* of crime above stated were found, except that the body of the deceased had been carried from the place where it was found to the house. Hutchinson and appellant were then arrested, and Hutchinson remarked, "You can't prove it." He and appellant looked at each other and smiled.

The daughter of the deceased was examined as a witness on the trial before the committing court, and also on both trials in the Circuit Court; her testimony differed in some material particulars on each trial. On the last examination she stated, in addition to the fact that there had been several difficulties between appellant and deceased, that on the night of the killing appellant and deceased were quarreling; that they all went to sleep, and some time during the night appellant got up and went to the bucket to get water; she did not know at what hour this occurred. Witness then went to sleep, and a little before daylight was awakened by her father, who came into the room, took off his shoes and put on a pair of boots; he then went to the bed where appellant was and asked her where he could get another pair of trousers, and on being informed where they were he took them and put them on in place of those he then wore; he then sent witness after water, which was some distance away, and when she returned the accused had prepared breakfast, and told witness to call her mother to breakfast; witness called her mother, but, receiving no answer, asked accused where her mother was, to which deceased replied that she was down at the stable getting some boards with which to build a chicken coop; witness then went down to the stable and there found the body of her mother; accused then told witness to call her father, which she did, and the three carried the body from the stable to the house.

Another witness stated that in the fall preceding the killing there was a fight between appellant and deceased, in which Hutchinson took part against deceased, knocking out one of her teeth, and that at this time accused said to him, "If you don't do what you promised, I will." It was also proved that Hutchinson wore a number 7 shoe; appellant, No. 5.

Admitting all the evidence to be true as given, and deducing therefrom all reasonable inferences, it is insufficient to establish that certainty of participancy in the crime by the appellant which the law requires. That murder was done there is no lack of proof; that it was done by the husband the evidence leaves no doubt, but the evidence fails in any manner to connect the appellant with the killing, or even to show that she had any knowledge of the homicide until the discovery of the body of the deceased by her daughter. Every fact proved by the evidence, or which may reasonably be inferred from it, except that of the unlawful intercourse between appellant and the husband, is as consistent with an hypothesis of her innocence as her guilt. The fact that she sent the daughter to the stable to find the deceased may have been either from a belief that she was there engaged in the occupation stated, or it may have been done with a design that the daughter should be put forward as the first discoverer of a secret crime; so the calling of the neighbors may have been in good faith the communication of the fact of the death of the deceased, and the method of her death may have been honestly believed, or it may have been a mere subterfuge to divert suspicion; no circumstance proved points necessarily to the guilt of the appellant; they are, it is true, consistent with her guilt, but they are not inconsistent with her innocence. The most unfavorable evidence is that which shows her unlawful intercourse with the husband of the deceased, but this does not warrant a conviction for another and distinct crime, nor withdraw from her the protection of that shield which the law permits every person, no matter how debased, to interpose against crime charged, the presumption of innocence, until the accusation is sustained by competent and sufficient proof.

*The judgment is reversed* and new trial awarded.